UNITED STATES OF AMERICA
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE
NO. 3:19-cv-309-CHB

NANCY FERRELL DAVIDSON            PLAINTIFF

v.        **VERIFIED COMPLAINT**

LOUISVILLE METROPOLITAN GOVERNMENT        DEFENDANT

    Serve:    Mayor Greg Fischer
                527 West Jefferson Street
                Louisville, Kentucky 40202

\* \* \* \* \*

Comes the Plaintiff, NANCY FERRELL DAVIDSON, by counsel, and for her Verified Complaint, states as follows:

**PARTIES**

1. At all times material and relevant herein, Plaintiff was and is a resident of Louisville, Jefferson County, Kentucky.

2. At all times material and relevant herein, Defendant Louisville Metropolitan Government was and is a governmental entity, organized, operated and existing under the laws of the Commonwealth of Kentucky, and having its principal place of business in Louisville, Jefferson County, Kentucky.

1

## JURISDICTION

3. This action arises under the United States Constitution, particularly under the provisions of the Fourth and Fourteenth Amendments, and under federal law, particularly the Civil Rights Act, Title 42 of the United States Code, Sections 1983 and 2000 et seq.

4. That this Court possesses jurisdiction for this case under 28 U.S.C. Sections 1331 and 1343, and this Court has pendent jurisdiction of Plaintiff's state court claims pursuant to 28 U.S.C. Section 1367.

5. That the amount in controversy exceeds $75,000, exclusive of interest, costs and attorney fees.

## MATERIAL FACTS

6. Plaintiff was employed as the Executive Assistant to John Walczak, Director of the Louisville Zoo, a division of Defendant Louisville Metro Government, from August of 2013 to June 2017, during which time as part of her job she managed his electronic mail account (Outlook), managed his document files and managed all appointments on his calendar.

7. Prior to this job, Plaintiff worked for Louisville Metro Government for twenty-five and one half (25 ½) years, the last fourteen (14) of which were as an Information Systems Specialist until she retired in February of 2012.

8. Sometime in December of 2014, a Zoo Facilities Manager had a verbal altercation with a female employee, which resulted in his resignation. At the request of John Walczak, Plaintiff prepared a resignation letter for the Facilities Manager to sign at separation. It was evident that Walczak was very unhappy about losing the Facilities Manager under these circumstances.

9. Following his resignation, the female employee applied for the position vacated by the Facilities Manager; however, a previous employee from the Zoo came back to fill the position.

10. The female employee involved in the altercation thereafter befriended the Plaintiff, whom the employee believed was sympathetic to her work situation.

11. Over a course of months, Plaintiff began to observe that the employee was being bypassed and excluded from important meetings and the female employee expressed that she was having supervisory difficulties with her underlings, most of whom were going over her head and reporting grievances directly to the new Facilities Manager and reporting issues to the union steward without first trying to resolve them according to protocol through their direct supervisor.

12. In September of 2016, after being written up immediately following bereavement leave for her brother, the female employee initiated an internal

Human Resources complaint with the Defendant as well as an external complaint with the Equal Employment Opportunity Commission (EEOC).

13. Plaintiff spoke with the female employee shortly after the employee returned from bereavement leave in August of 2016 about a common incident of motorcycle safety. Minutes after the female employee departed Plaintiff's office, Assistant Zoo Director Stephanie Moore came into Plaintiff's office, closed the door, and instructed Plaintiff not to engage in conversation with the female employee because she was "trouble." The Plaintiff assured Moore that they were not discussing work, only common experiences involving motorcycle death.

14. As the weeks continued to pass, Plaintiff continued to observe the maintenance crew and upper management bypassing the female employee completely instead of working with her directly and following the chain of command per Zoo protocol.

15. After the internal Human Resources investigation was concluded, Plaintiff became aware that the initial investigative report on the matter was being repeatedly and falsely revised and going through change after change, all before the female employee had ever seen the original investigative report and recommendations of Metro Human Resources. The original investigative report was submitted to the Zoo before Thanksgiving of 2016. The revised investigative

report was dated February 3, 2017.   The second revised report was dated February 9, 2017.   The third and final revised report was dated March 13, 2017.

16.   The female employee requested Plaintiff give her copies of email and correspondence to help her case, but the Plaintiff refused due to her position at the Zoo.   The Plaintiff told the female employee that she should file an Open Records Request (ORR) for that information as it all should have been public record.

17.   Plaintiff became aware that while the initial report substantiated the female employee's claims, each subsequent revision shifted more and more of the responsibility from the Zoo falsely to the female employee, until the final report wrongfully absolved the Zoo of any wrongdoing whatsoever and untruthfully placed all of the blame squarely upon the female employee.

18.   Over the course of months, the female employee and the Plaintiff would talk about work or personal things, as friends/co-workers often do. No information was passed between the two individuals of a confidential nature.   At that juncture, the Human Resources case involving the female employee was common knowledge among the Zoo employees.   The female employee was getting information from several sources at the Zoo.

19.   In June of 2017, the female employee eventually resigned from her position at the Zoo.   She asked the Plaintiff to print out her resignation, as she had

given it to the Zoo Director and the Human Resources Manager but had not printed a copy for herself. The Plaintiff printed that for her on June 22, 2017, as she felt that the employee had a right to have a copy of her own resignation.

20. Following the female employee's request for a copy of her resignation, Plaintiff advised the female employee to immediately get any emails she wanted from her email account as the Plaintiff had been instructed by the Director to disable her email access. In the meantime, the Assistant Director instructed Plaintiff not to disable the account because she wanted to access the female employee's email.

21. In June of 2017, Plaintiff changed jobs at the Zoo from Executive Assistant to Information Systems Administrator, which resulted in a substantial pay increase for Plaintiff. Plaintiff had fourteen (14) years experience in Information Technology for Metro Government prior to her retirement.

22. The Director allowed Plaintiff to accept this promotion with the proviso that Plaintiff would continue to support him until his Executive Assistant position was filled. In addition, Plaintiff was to train the new assistant and compile the five (5) year application required for accreditation with the Association for Zoos and Aquariums (AZA).

23. In August of 2017, Michele Thomas was hired as the new Executive

Assistant to the Director. Thomas was trained by the Plaintiff per the agreement with the Director before accepting her promotion. During the initial training, Plaintiff advised Thomas that she would be seeing emails coming through that were confidential and that she should not open those, but rather consult the Director for further instructions.

24. While Plaintiff and the former female employee continued to correspond sporadically, Plaintiff was busy training the new Executive Assistant, compiling the Zoo's Accreditation application, supervising a part-time Information Systems Technician, and overseeing the Information Systems for the Zoo, which included several projects involving the Point of Sale (POS) system.

25. Ms. Thomas was terminated on January 30, 2018. On the date of Ms. Thomas' termination, Ms. Thomas emailed the Plaintiff to inform her of the termination. Plaintiff spoke later with former female employee via text and asked if she still needed an Office Manager for her business. The former female employee indicated she was still looking for help so Plaintiff advised her of Thomas' termination and offered to reach out to Thomas. Ms. Thomas had previously worked as an Office Manager at Bellarmine University and was obviously qualified for the position.

26. Plaintiff called Ms. Thomas that evening to check on her, as she knew

that she was upset about the termination. She then asked her about the instruction she had been given by the Director about confidential emails, and whether she had read them. Ms. Thomas informed her she had not read the emails. Upon Plaintiff determining that no conflict of interest existed between the Zoo and the former female employee, Plaintiff told Thomas about the Office Manager job opening. Plaintiff then gave the former female employee Ms. Thomas' number so that they could meet and discuss the job opening. The Plaintiff had no additional involvement in the relationship between the female employee and Ms. Thomas.

27. On or about March 6, 2018, Plaintiff received a voice message from the former female employee, advising her that the former female employee had "given the judge her name." Upon receiving the message, the Plaintiff called the former female employee to determine the context in which her name had been given to a judge. The former female employee advised that "the judge wanted a name", that "they thought it was Michele (Thomas), and I didn't want them to think it was Michele, and I gave them your name". Again, the Plaintiff asked, in what context was her name given to a judge. The former female employee was hesitant and indirect and wouldn't specify what she meant by that statement. At that point, the Plaintiff reminded the former female employee, as she had in previous conversations, that she would never lie if she was called to testify in court, but she

8

would not corroborate anything she didn't know about. She would not be her "default witness" to anything that she had not been privy to just because they were "friends". The Plaintiff then ended the phone conversation. That was the last contact that the Plaintiff had with the former female employee.

27. The following day, the Plaintiff had a regularly scheduled meeting with her direct supervisor, Assistant Director Stephanie Moore. As the regular meeting concluded, the Plaintiff told Moore about her unusual conversation with the former female employee the day before. Plaintiff told Moore that she considered the former female employee to be a friend. Upon further conversation, she informed Moore that she was the one who had put Ms. Thomas in touch with the former female employee about a job. The Plaintiff told Moore that she had always thought that she and others might be called to testify in her case at some point, but the Plaintiff had emphasized to the former female employee that she would not corroborate anything that she had not witnessed. It is important to note that the Plaintiff did tell Moore that, based on her knowledge of the events, she did believe that the former female employee had been sexually harassed, discriminated against and retaliated against as well.

28. The next day, the Plaintiff received a meeting request from Moore, something to the effect "Follow-up from yesterday's meeting". She accepted the

meeting request. Moore came to collect the Plaintiff for the meeting. As they were walking back to Moore's office, Moore informed Plaintiff that she had told the Zoo's attorneys about the conversation the day prior. Moore assured the Plaintiff that the attorneys were there not only to protect Walczak, Sean Woods and Moore, but Plaintiff as well. She then informed the Plaintiff that the attorneys were in Walczak's office and were going to talk to her.

29. The attorneys first asked Plaintiff to recount the conversation she had with the former female employee two days before. The attorneys explained to Plaintiff what had actually happened in court. From the phone conversation with the former female employee, it appeared that she was identifying the Plaintiff as what they described as "the mole." At this juncture, Plaintiff was shocked to learn that she was being identified as "the mole." The attorneys cross-examined and questioned the Plaintiff for three (3) hours and Plaintiff signed an affidavit that day confirming that she did not provide any confidential documents to the former female employee, although Plaintiff was never given a copy of the affidavit that she signed. At this point, Plaintiff removed the former female employee from her contacts on her phone and cut off all communication with her.

30. From March 8, 2018, to August 14, 2018, the Plaintiff had virtually no contact with the former female employee and continued about her job as

Information Systems Administrator without incident. On or about August 14, 2018, Plaintiff was called into a meeting with the attorneys in Walczak's office. The Zoo attorneys confronted the Plaintiff with certain text messages between her and the former female employee. They falsely alleged that Plaintiff had given confidential information or documents to the former female employee, which was and is patently untrue. They also told Plaintiff that her March 8, 2018, affidavit was "not worth the paper it was written on." The Plaintiff again denied giving anyone any confidential information or documents at any time. This inquisition and cross-examination lasted about one hour and a half (1 ½) where the Zoo attorneys repeatedly accused, badgered and attempted to intimidate Plaintiff into admitting she had given the former female employee confidential information or documents. The Plaintiff refused to be intimidated and stood her ground with respect to all of her previous statements. The Plaintiff told the Zoo attorneys on both occasions that based on her knowledge of events, she did believe that the former female employee had been sexually harassed, discriminated against and had experienced retaliation. This had also been previously expressed to the Director and the Assistant Director by the Plaintiff.

31. On or about August 16, 2018, Plaintiff was called into the Human Resources Office, advised by memo that she was "suspended pending

investigation" by the Assistant Director and told to turn in her keys and both her Zoo and Metro badges.   Plaintiff was then told to gather her belongings whereupon she was escorted to her office to get her things and then ultimately escorted off the premises.   The gate code was immediately changed thereafter, which is what occurs when someone is terminated at the Zoo.

32.   The aforesaid memo advised that she would hear from Human Resources within ten (10) days.   When she did not hear from Human Resources within ten (10) days, a letter was sent to Human Resources and the Zoo attorneys requesting that Plaintiff be reinstated to work immediately.

33.   Following the receipt of the letter, Human Resources contacted Plaintiff and asked her to come in on August 30, 2018.   Plaintiff initially accepted. Unaware that her attorney would be out of town on that date, she subsequently attempted to reschedule for the next week after his return.   Human Resources indicated that they would call her back to reschedule, but that assertion proved false.   On or about September 7, 2018, Plaintiff received a letter terminating her employment alleging she engaged in misconduct in 2016 and 2017, falsely stating that she secretly disclosed confidential communications and email, including correspondence to and from attorneys at the Zoo, and falsely citing violations of LMG personnel policies 1.5 (5)(b), (c), (g), and (l) and falsely claiming violations

of apparently non-existent Information Security and Technology policies 3.1.1(b)(protecting confidentiality); (c)(permitting access to confidential attorney/client privileged information to unauthorized individuals); (h); (j); (k); and (r), the likes of which have never been seen or produced despite repeated requests by Plaintiff and her counsel.

34. On or about September 10, 2018, Plaintiff filed for unemployment benefits against the Defendant.

35. On or about September 25, 2018, Plaintiff was interviewed by an incompetent unemployment investigator who had no grasp of the facts or issues of the case and who denied her unemployment claim out of hand relying on false statements of material fact made by Defendant.

36. On or about October 9, 2018, Plaintiff appealed the denial of her unemployment benefits.

37. On or about November 5, 2018, Plaintiff's appeal was heard and a final determination made that she was discharged for reasons other than misconduct and she was awarded benefits retroactively to September 9, 2018.

38. At all times during the unemployment and administrative proceedings, the Plaintiff was Nancy F. Davidson and the employer was the Defendant Louisville Metropolitan Government.

39. On or about March 1, 2019, Plaintiff electronically filed her complaint with the EEOC, resulting in a charge from the Equal Employment Opportunity Commission on or about April 2, 2019.

40. On or about April 8, 2019, Plaintiff received her right to sue letter.

### COUNT I – WRONGFUL TERMINATION

41. Plaintiff adopts, alleges and incorporates by reference, each and every averment, allegation or statement contained in paragraphs 1 through 39 of this Complaint.

42. That the Plaintiff cooperated in every aspect of the internal investigation by Human Resources, including but not limited to telling the Executive Director, the Assistant Director and the attorneys for the Zoo that the former female employee had been sexually harassed, discriminated and retaliated against by various Zoo employees.

43. That the Defendant wrongfully terminated the Plaintiff, first by creating false allegations against her, then suspending her and ultimately terminating her from the Zoo.

44. That as a direct and proximate result of the aforementioned actions of the Defendant, Plaintiff has sustained and continues to sustain pain and suffering, humiliation and embarrassment, lost wages and damages to her reputation.

## COUNT II – RETALIATION

45. Plaintiff adopts, alleges and incorporates by reference, each and every averment, allegation or statement contained in paragraphs 1 through 44 of this Complaint.

45. That the Plaintiff cooperated in every aspect of the internal investigation by Human Resources, including but not limited to telling the Executive Director, the Assistant Director and the attorneys for the Zoo that the former female employee had been sexually harassed, discriminated and retaliated against by various Zoo employees.

46. That the Defendant retaliated against the Plaintiff, first by creating false allegations against her, then suspending her and ultimately terminating her from the Zoo.

47. That as a direct and proximate result of the aforementioned actions of the Defendant, Plaintiff has sustained and continues to sustain pain and suffering, humiliation and embarrassment, lost wages and damages to her reputation.

## COUNT III - WHISTLEBLOWER

48. Plaintiff adopts, alleges and incorporates by reference, each and every averment, allegation or statement contained in paragraphs 1 through 47 of this Complaint.

49. That the Plaintiff disclosed false statements and corruption on the part of upper management at the Louisville Zoo.

50. That the Plaintiff is a protected party under the Kentucky Whistleblower Act, KRS 61.102 set eq., and entitled to said protections for exposure of fraud and corruption.

51. That as a direct and proximate result of the aforementioned actions of the Defendant, Plaintiff has sustained and continues to sustain pain and suffering, humiliation and embarrassment, lost wages and damages to her reputation.

## COUNT IV - DEFAMATION

52. Plaintiff adopts, alleges and incorporates by reference, each and every averment, allegation or statement contained in paragraphs 1 through 51 of this Complaint.

53. That the Defendant's creation, maintenance and both spoken and written dissemination of false material acts and actions wrongfully attributed to the Plaintiff is both slanderous and libelous and constitutes the tort of outrageous conduct.

54. That as a direct and proximate result of the aforementioned actions of the Defendant, Plaintiff has sustained and continues to sustain injuries, pain and suffering and lost wages and damage to reputation.

## COUNT V – PUNITIVE DAMAGES

55. Plaintiff adopts, alleges and incorporates by reference, each and every averment, allegation or statement contained in paragraphs 1 through 54 of this Complaint.

56. That the aforesaid conduct of the Defendant was negligent, grossly negligent, willful, intentional, malicious, oppressive, and/or fraudulent, and that Plaintiff is entitled to punitive damages from the Defendant.

## COUNT VI – COLLATERAL ESTOPPEL

57. Plaintiff adopts, alleges and incorporates by reference, each and every averment, allegation or statement contained in paragraphs 1 through 56 of this Complaint.

58. That by virtue of the privity of the same individuals as Plaintiff and Defendants throughout the legal/administrative proceedings and the prior finding of discharged for reasons other than misconduct, the Defendants are bound by this finding and collaterally estopped from alleging in this action that Plaintiff was discharged for misconduct or any reasons of misconduct.

## COUNT VII – TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS

59. Plaintiff adopts, alleges and incorporates by reference, each and every

averment, allegation or statement contained in paragraphs 1 through 58 of this Complaint.

60. That the Defendant, by and through its various agents and employees, has and continues to tortuously interfere with Plaintiff's business relationships and employment relationships.

61. That as a direct and proximate result of the aforementioned actions of the Defendant, Plaintiff has sustained and continues to sustain pain and suffering, humiliation and embarrassment, lost wages and damages to her reputation.

**PRAYER**

WHEREFORE, the Plaintiff demands as follows:

1. That Plaintiff be awarded general and compensatory damages, including prejudgment interest, in the sum of $1,000,000;

2. Punitive damages in the sum of $3,000,000;

3. Trial by jury on all issues so triable;

4. Judgment against the Defendant;

5. Her attorney fees and costs expended herein;

6. Collateral estoppel against Defendant from alleging, claiming or inferring that Plaintiff was discharged for misconduct or any reasons of misconduct;

7. For any and all equitable relief; and

8. Any and all other relief to which she may appear equitably entitled.

    Respectfully submitted,

    /s/ Timothy Denison
    TIMOTHY DENISON
    Counsel for Plaintiff
    235 South Fifth Street
    The Third Floor
    Louisville, Kentucky 40202-3226
    (502) 589-6916; (FAX) 568-6919
    timothydenison@aol.com

## **VERIFICATION**

I have read the foregoing VERIFIED COMPLAINT and it is true and correct as I verily believe.

    /s/ Nancy Ferrell Davidson
    NANCY FERRELL DAVIDSON

COMMONWEALTH OF KENTUCKY

COUNTY OF JEFFERSON

Subscribed and sworn before me by NANCY FERRELL DAVIDSON as true and accurate on this 23rd day of April, 2019. My commission expires: 7/28/2021.

    /s/ Timothy Denison
    NOTARY PUBLIC, SAL, KENTUCKY